Geoffrey R. Kaiser, Esq. (GK-6991)
Kaiser Law Firm, PLLC
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 570-3071

**AMON, CH.J.**

Attorneys for [under seal]

**CV 14-4581**

**GOLD, M.J.**

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------
                                            :
UNITED STATES OF AMERICA and       :   Case No. _____
NEW YORK STATE, ex rel.            :
[UNDER SEAL],                      :
                                   :   COMPLAINT  FOR VIOLATIONS OF
            Plaintiffs,            :   FEDERAL CIVIL FALSE CLAIMS ACT
                                   :   [31 U.S.C §§ 3729 *et seq.*]  and NEW YORK
        vs.                        :   FALSE CLAIMS ACT [N.Y. Finance Law §§
                                   :   187 *et seq.*]
[UNDER SEAL],                      :
                                   :   **(FILED *IN CAMERA* AND UNDER SEAL)**
            Defendants.            :
                                   :
-----------------------------------------------

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and NEW YORK STATE, ex rel. FNU-LNU LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| vs. | : | |
| NEW YORK CARDIOLOGY, P.C. and GHANSHYAM BHAMBHANI, | : | |
| | : | |
| Defendants. | : | |

Case No. _____

COMPLAINT FOR VIOLATIONS OF FEDERAL CIVIL FALSE CLAIMS ACT [31 U.S.C §§ 3729 *et seq.*] and NEW YORK FALSE CLAIMS ACT [N.Y. Finance Law §§ 187 *et seq.*]

JURY TRIAL DEMANDED

**(FILED *IN CAMERA* AND UNDER SEAL)**

-------------------------------------------------------x

Plaintiff-Relator FNU-LNU LLC, through its attorneys of record, on behalf of the United States of America and New York State, for its Complaint against Defendants New York Cardiology, P.C. ("NY Cardiology") and Ghanshyam Bhambhani, M.D. ("Dr. Bhambhani"), alleges based upon personal knowledge, relevant documents, and information and belief, as follows:

I.   **NATURE OF THE ACTION**

1.     This is an action to recover damages and civil penalties on behalf of the United States of America and New York State arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendants and/or their agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*

2

2.    As detailed below, Defendants knowingly engaged in a fraudulent course of conduct that, on information and belief, caused millions of dollars in losses to the Medicare and Medicaid programs, by generating patient referrals through the payment of unlawful financial inducements to other providers, in violation of the federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)), and by inducing payments for cardiac tests and procedures through fraudulent documentation and

3.    Specifically, Defendants engaged in an elaborate kickback scheme involving the payment of grossly inflated "rent" payments and other financial inducements to medical providers in return for patient referrals for cardiac testing. Those test procedures were performed at medical facilities with which Dr. Bhambhani had compensation arrangements that paid him large annual stipends (ranging from approximately $300,000 to approximately $1,000,000) based on an expected number of cardiac test referrals to the hospitals over the course of the year. In order to generate the number of cardiac test procedures required for Dr. Bhambhani to earn his annual stipends, Defendants had unlawful kickback arrangements with providers in at least 10 medical offices located in Queens, Brooklyn, Bronx and Manhattan. In addition, Defendants routinely created false medical documentation, including by cutting and pasting the identifying information of patients onto test reports generated in relation to entirely different patients, in order to manufacture the medical justification required for insurance pre-authorization of the cardiac test procedures.    The medical facilities, not realizing that Dr. Bhambhani had fraudulently generated the patient referrals through illegal kickbacks and had also created false documentation in order to obtain insurance pre-authorizations for the procedures, then billed both the professional and technical components of the procedures to insurers, including Medicare and Medicaid.

3

4.     The fraudulent practices described above constituted "false and fraudulent" claims under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.* and the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.* Such claims cheated the government and unlawfully enriched the Defendants. Therefore, Plaintiff/Relator, FNU-LNU LLC seeks to recover all available damages, civil penalties, and other relief for violations alleged herein.

**II.     PARTIES**

5.     Plaintiff-Relator FNU-LNU LLC ("Relator") is a New York limited liability company headquartered on Long Island. The sole member of FNU-LNU LLC is a physician licensed to practice in New York State ("Dr. A") who was employed by NY Cardiology, beginning on or about July 1, 2013. In that position, Dr. A personally interacted with Dr. Bhambhani on many occasions and witnessed the events that are described in the allegations herein. Upon learning of these fraudulent activities, Dr. A resolved to report Dr. Bhambhani's misconduct to law enforcement and resign his position with NY Cardiology, which he did, effective August 15, 2014. On or about September 2, 2014, Dr. A is scheduled to start a new position as a cardiologist with a medical center located in upstate New York.

6.     Defendant New York Cardiology, P.C. is a New York professional corporation, with its main office located at 10706 Liberty Avenue, Ozone Park, NY.

7.     Defendant Ghanshyam Bhambhani, M.D. is a physician licensed to practice in New York State and, on information and belief, resides in Valley Stream, New York.

**III.     JURISDICTION AND VENUE**

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers

jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Relator is the original source of the facts and information alleged in this Complaint.

9.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, the Defendants can be found in this District and transact business in this District.

10.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because the Defendants can be found in and transact business in this District. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this District, maintained employees in this District and can otherwise be found and reside in this District.  In addition, statutory violations, as alleged herein, occurred in this District.

## IV.    APPLICABLE LAW

### A.      The False Claims Act

11.     The FCA was originally enacted during the Civil War and was substantially amended in 1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

12.     The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim" paid or approved by the federal government, or "material to an obligation to pay" money to the government and further prohibits knowingly concealing and improperly avoiding or decreasing "an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(B), (G). Pursuant to 31 U.S.C. § 3729(a)(1)(B), a false or fraudulent statement or record that is made for the purpose of causing the government to pay a claim, even if the fraudulent statement or record is not proffered directly to the government, is still actionable where there is some nexus between the statement or record and the payment of the claim. Furthermore, both affirmative misrepresentations and the omission of facts material to a governmental decision to pay can render a claim false under the FCA. The FCA also prohibits two or more parties from conspiring to violate any of the liability provisions of the statute. 31 U.S.C. § 3729(a)(1)(C).

13.     Any person who violates, or conspires to violate, the FCA is liable for a civil penalty of up to $11,000 per claim for claims made on or after September 29, 1999, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a).

14.     The FCA does not require direct contact between a defendant and the government. By its terms, the FCA imposes liability on any person who presents or *causes* to be presented a false or fraudulent claim to the government (or false statement in support of a false or fraudulent claim). See 31 U.S.C. § 3729(a).

15.     To "cause" an FCA violation, it is not necessary that a defendant's fraudulent conduct be the last in the series of events that results in financial loss to the government. As

applied by the courts, the standard for "causation" under the FCA is whether the submission of a false or fraudulent claim was "reasonably foreseeable" from a defendant's actions. Under this standard, a defendant's fraudulent conduct can occur anywhere in the chain of events leading to financial loss by the government, and can be an indirect, as well as direct, cause of the loss. Moreover, the defendant need not be the recipient or beneficiary of the false claim. All that is required is that the defendant, by its fraudulent conduct, set in motion a series of events which results in a reasonably foreseeable loss to the government.

16.    The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

17.    The federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)) prohibits the payment or solicitation of any form of remuneration (directly or indirectly, overly or covertly, in cash or in kind) in exchange for the referral or any item or service payable under a federal health care program, including Medicare and Medicaid. A "false claim" is defined by statute to include any claim incorporating items or services resulting from a violation of the anti-kickback statute:

> (g) In addition to the penalties provided for in this section [i.e., 42 U.S.C. § 1320a-7b] . . . a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [31 U.S.C. §§ 3729 et seq.]

18.    The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants

during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

19.     The New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, is modeled after the FCA, and its liability provisions are virtually identical.  Similarly to the FCA, any person who violates, or conspires to violate, the New York False Claims Act is liable for three times the amount of the damages sustained by New York State.  In addition, a violator faces a civil penalty of up to $12,000 per claim.

### B.     The Federal Health Care Programs

20.     The health care programs described in the paragraphs below, and any other government-funded healthcare programs, shall be referred to as "Federal Health Care Programs."

21.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare") is a health insurance program administered by the United States that is funded by taxpayer revenue.  Entitlement to Medicare is based on age, disability or affliction with certain diseases.  The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS").  Medicare provides for payment of hospital services, medical services, durable medical equipment and prescription drugs on behalf of Medicare-eligible beneficiaries.

22.     Medicare does not pay for services which are not "reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." 42 U.S.C. § 1395y.  Claims submitted to Medicare for payment, whether submitted on a paper UB-04 (CMS-1450) Claim Form, or electronically, also carry certifications of truth and accuracy.  The paper Claim Form carries a certification that the billing information on the form is true, accurate and complete, and that the provider submitting the form did not knowingly or recklessly disregard or misrepresent or

8

conceal material facts. UBS-04 (CMS-1450) Form. The Claim Form further states that the person or entity submitting the form "understands that misrepresentation or falsification of essential information as requested" by the form "may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment . . . ." _Id._ Those who submit claims electronically are likewise required to certify that the claims are "accurate, complete and truthful" and to "acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim . . . may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Medicare Claims Processing Manual, Chapter 24, 30.2.

23.   When providers enroll in the Medicare Program, they further agree as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application, at p. 31 (Emphasis added).

24.   The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid") is a health insurance program administered by the United States and individual states and is funded by federal, state and local taxpayer revenue. The Medicaid Program is overseen by HHS through CMS. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially

9

needy individuals that qualify for Medicaid.  The Medicaid program pays for services pursuant

to plans developed by the States and approved by HHS through CMS.  42 U.S.C. §§ 1396a(a)-

(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical

items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The

federal government then pays each state a statutorily established share of "the total amount

expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This

federal-to-state payment is known as Federal Financial Participation.  Like Medicare, Medicaid

does not pay for medically unnecessary services. 42 U.S.C. §§ 1396-1, 1396d; New York State

Medicaid Program, General Policy, at pp. 18, 24.

25.     New York maintains a federally-approved Medicaid program to reimburse health

care charges made by physicians and other health care providers for the treatment of many low-

income New York citizens not covered by Medicare or private insurance.  Claims submitted to

the New York Medicaid Program cause payments to be made by both the United States and New

York State.  The United States and New York State contribute approximately half the cost of

each claim submitted to the New York Medicaid Program.  Providers apply to participate in the

New York Medicaid Program and agree as a condition of both participation and payment to

comply with all the policies and procedures of the New York Department of Health ("DOH"),

which administers the Medicaid Program in New York State.  All claims submitted to the

Medicaid Program, whether on paper or electronically, carry a Claim Certification Statement that

certifies the provider's agreement to these conditions. The Certification Statement further states

that all information included on the claim form is "true, accurate and complete" and that "no

material fact has been omitted." New York State Medicaid Program, Information for All

Providers, General Billing, p. 6; eMedNY/Medicaid Management Information System,

Certification Statement for Provider Billing Medicaid.  In addition, the Certification Statement includes an acknowledgement that "payment and satisfaction of this claim will be from federal, state and local public funds and that I may be prosecuted under applicable federal and state laws for any false claims, statements or documents or concealment of a material fact." *Id.*

26.     DOH policies and procedures include an explicit exclusion from Medicaid coverage for medical care and services that are "fraudulently claimed" or "represent abuse or overuse," and define as an "unacceptable practice" when a provider "knowingly [makes] a claim for an improper amount or for unfurnished, inappropriate or excessive care, services or supplies." DOH also defines Medicaid fraud to include a provider who "submits false information for the purpose of obtaining greater compensation than that to which he/she is legally entitled." New York State Medicaid Program, Information for All Providers, General Policy, pp. 22-25. DOH further reserves the right to recover any overpayments, including "any amount not authorized to be paid under the Medicaid Program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." Id.

27.     To participate in Medicare and Medicaid, providers must be duly licensed and authorized by the States in which they practice to render professional services.  See Medicare General Information, Eligibility and Entitlement, Chapter 5, 70.3; 18 NYCRR § 505.12.

## V.      FACTS UNDERLYING THE FRAUD SCHEME

### A.   The Scheme to Generate Patient Referrals Through Illegal Kickbacks

28.   Dr. Bhambhani had compensation arrangements with medical facilities, including hospitals and diagnostic imaging centers, under which he received large annual stipends (ranging from approximately $300,000 to approximately $1,000,000) based on an anticipated number of cardiac test referrals for nuclear stress tests, cardiac catheterizations and/or peripheral angiograms.   More than eighty percent of the patients receiving these tests were covered by either Medicare or Medicaid.   NY Cardiology performed the tests.   The medical facilities would bill and obtain reimbursement for both the professional and technical components of the tests.

29.   In order to ensure that he referred the required number of cardiac tests each year to the medical facilities, Dr. Bhambhani paid illegal kickbacks to other physicians, in the form of grossly inflated monthly "rental" payments of between $1000 and $1800 for the use of two small rooms at the referring provider's location for just two days each month.   Sometimes, for smaller practices, Dr. Bhambhani would also make cash payments of $100 for each patient referral that resulted in a nuclear stress test, cardiac catheterization and/or peripheral angiogram.   Dr. Bhambhani never disclosed to the medical facilities that he generated his cardiac test referrals through criminal kickback arrangements that violated the federal anti-kickback statute.

30.   Dr. Bhambhani would typically advise the referring provider that he required anywhere between 10 and 18 patient referrals per month.   For the larger referring practice groups, Dr. Bhambhani would offer to become their "employee" (without any formal written agreement), and explain that the referring practice could bill for all consults, electrocardiograms and echocardiograms performed by his practice, provided that Dr. Bhambhani was allowed to

keep all the referrals for nuclear stress tests, cardiac catheterizations and peripheral angiograms. For the smaller referring practice groups, NY Cardiology would itself bill for the consults, electrocardiograms and echocardiograms. In the case of one small referring practice located in Astoria, Dr. Bhambhani was paying $1800 per month for one small room and demanded 18 patient referrals per month in exchange. When the provider was unable to meet this quota, Dr. Bhambhani retaliated by not paying "rent." Dr. Bhambhani would also systematically bill in his own name for interpretations of echocardiograms that were actually performed by a technician who was neither licensed nor qualified to interpret such tests.

31.   As a matter of course, every patient who was referred to Defendants would receive an echocardiogram and be scheduled for a nuclear stress test, regardless of what the echocardiogram showed about the patient's condition. Indeed, Dr. Bhambhani threatened to withhold the salary of Dr. A unless he routinely ordered these tests and would audit his charts to ensure the tests were being ordered. Dr. A initially trusted that the pre-authorization process would prevent excessive numbers of tests from being billed, unaware that Dr. Bhambhani was gaming the system by directing staff to create fraudulent documentation in order to secure the required pre-authorizations. Dr. Bhambhani frequently boasted to Dr. A that he had developed a system to "fry all the fish" he received from his paid referral sources and he recounted to Dr. A how other cardiology groups were amazed that he always seemed able to secure pre-authorizations for his cardiac test procedures even when those other groups were unsuccessful.

32.   As described in more detail below, Defendants would manufacture whatever medical justification was required to make certain that insurers, including Medicare and Medicaid, paid for the echocardiograms, nuclear stress tests and any other cardiac procedures (e.g., cardiac catheterizations and peripheral angiograms) that were ordered for the patients. In addition to

paying for referrals through illegal kickbacks as described above, Dr. Bhambhani ensured a steady supply of patient referrals to the hospitals by directing that all patients be scheduled for a 6 month follow-up visit, at which time the patients would again receive an echocardiogram and, at a minimum, be scheduled for a nuclear stress test.

33.  When, on one occasion, Dr. A asked Dr. Bhambhani whether he was concerned that performing so many tests would trigger a government inquiry, Dr. Bhambhani responded, "The government takes so much from me, I can take some back."  On another occasion, Dr. Bhambhani boasted to Dr. A that Dr. Bhambhani was worth $100 million, that he had money hidden in the United States and overseas, and that if Dr. A ever required assistance in secreting money, Dr. Bhambhani could advise Dr. A on that subject.

### B.  The Scheme to Seek Reimbursement Based on Fraudulent Documentation

34.  As noted, Defendants engaged in a scheme to create false medical documentation in support of cardiac test procedures, including echocardiograms, nuclear stress tests, cardiac catheterizations and peripheral angiograms.  For many insurance plans, including many Medicare and Medicaid plans, these procedures required insurance pre-authorizations in order to be reimbursable.

35.  Dr. Bhambhani routinely directed his office manager, Reshma Singh, to falsify the underlying medical documentation in order to manufacture the medical necessity required for ordering the procedures.  Singh would take identifying information for patients whose medical conditions did not justify the cardiac testing and attach it to abnormal test results that had been generated in connection with other patients for whom such additional testing (e.g., echocardiograms, nuclear stress tests, cardiac catheterizations or peripheral angiograms) was medically indicated.  Singh then faxed the documentation to Medicare, Medicaid and private

insurance plans in order to elicit the required pre-authorizations. Defendants never disclosed to the billing facilities that the cardiac procedures were generated through illegal kickbacks and based on fraudulent medical documentation.

36. Dr. A conducted post-procedure examinations of two patients who had undergone cardiac catheterizations ordered by Dr. Bhambhani. Cardiac catheterizations are intrusive procedures in which a thin, flexible tube is inserted into a blood vessel located in the arm, upper thigh or neck and threaded to the heart for the purpose of performing diagnostic testing on the heart. For both patients, Dr. Bhambhani had entered notes in the medical record indicating that the patients had abnormal nuclear stress tests requiring the catheterization procedure. In reality, the stress tests for both patients were normal and, on information and belief, Dr. Bhambhani had falsified the notes and test reports for these patients in order to obtain insurance pre-authorizations for the catheterization procedures that were performed.

## VI.  **CAUSES OF ACTION**

### COUNT ONE
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(A)

37. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 36 above as though fully set forth herein.

38. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

39. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States government for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

40.   The United States, unaware of the falsity of the claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

41.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

42.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT TWO
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(B)

43.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 36 above as though fully set forth herein.

44.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, that were material to false or fraudulent claims, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

45.   The United States, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

46.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

47.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

16

## COUNT THREE
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(G)

48.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 36 above as though fully set forth herein.

49.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

50.   The United States, unaware of the falsity of the records and statements and of the Defendants' concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

51.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

52.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT FOUR
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(C)

53.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 36 above as though fully set forth herein.

54.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

55. By virtue of the acts described above, Defendants conspired with each other and with others unknown to defraud the United States by inducing the United States to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of 31 U.S.C. § 3729(a)(1)(C). Defendants, moreover, took substantial steps in furtherance of the conspiracy, *inter alia*, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

56. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

57. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(1)(C) as described herein.

## COUNT FIVE
### (New York False Claims Act)
### N.Y. Finance Law § 189(1)(a)

58. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 36 above as though fully set forth herein.

59. This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq*., as amended.

60. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to New York State for payment or approval, within the meaning of N.Y. Finance Law § 189(1)(a).

61. New York State, unaware of the falsity of the claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

62.     By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

63.     Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

**COUNT SIX**
**(New York False Claims Act)**
**N.Y. Finance Law § 189(1)(b)**

64.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 36 above as though fully set forth herein.

65.     This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, as amended.

66.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, material to false or fraudulent claims, within the meaning of N.Y. Finance Law § 189(1)(b).

67.     New York State, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

68.     By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

69.     Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT SEVEN
### (New York False Claims Act)
### N.Y. Finance Law § 189(1)(g)

70.     Relator repeats and realleges each and every allegation contained in paragraphs 1
through 36 above as though fully set forth herein.

71.     This is a claim for treble damages and penalties under the New York False Claims
Act, N.Y. Finance Law §§ 187 *et seq.*, as amended.

72.     By virtue of the acts described above, Defendants knowingly made, used, or caused
to be made or used, a false record or statement material to an obligation to pay or transmit money
or property to the Government, or knowingly concealed or knowingly and improperly avoided or
decreased an obligation to pay or transmit money or property to the Government, within the
meaning of N.Y. Finance Law § 189(1)(g).

73.     New York State, unaware of the falsity of the records and statements and of the
Defendants' concealment and unlawful conduct, was denied an opportunity to claim and demand
return of the money and property to which it was legally entitled.

74.     By reason of the Defendants' acts, New York State has been damaged, and continues
to be damaged, in a substantial amount to be determined at trial.

75.     Additionally, New York State is entitled to the maximum penalty of $12,000 for
each and every false and fraudulent claim made and caused to be made by Defendants arising
from their unlawful conduct as described herein.

## COUNT EIGHT
### (New York False Claims Act)
### N.Y. Finance Law § 189(1)(c)

76.     Relator repeats and realleges each and every allegation contained in paragraphs 1
through 36 above as though fully set forth herein.

77.     This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, as amended.

78.     By virtue of the acts described above, Defendants conspired with each other and with others unknown to defraud New York State by inducing New York State to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of NY Finance Law § 189(1)(c). Defendants, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

79.     By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

80.     Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Relator, acting on behalf and in the name of the United States of America and New York State, demands and prays that judgment be entered against Defendants under the Federal False Claims Act as follows:

(1)     That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.* and N.Y. Finance Law §§ 187 *et seq.* as set forth above;

(2)     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions,

plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

      (3)    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that New York State has sustained because of defendants' actions, plus a civil penalty of not less than $6,000 and not more than $12,000 for each violation of N.Y. Finance Law §§ 187 *et seq.*

      (4)    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and N.Y. Finance Law § 190; and

      (5)    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

      (6)    That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: July 31, 2014

By: _____
Geoffrey R. Kaiser, Esq. (GK-6991)
Kaiser Law Firm, PLLC
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 570-3071

Attorneys for Plaintiff-Relator
 FNU-LNU LLC

22